20-5158 National Council for Adoption, Appellant v. Antony J. Blinken, in his official capacity as U.S. Secretary of State et al., Mr. Hay for the appellant, Ms. Lopez for the appellate. Good morning. Good morning, Your Honor. You may proceed. May it please the Court, Daniel behalf of its members, agency guidance that imposed new obligations, requirements, prohibitions, and compliance requirements on all accredited adoption service providers, without notice and comment, and without fully considering the far-reaching and harmful consequences of the rule it adopted. The threshold question in this appeal is whether an association of the very adoption service providers being regulated, a standard challenge to that regulation. Under this Court's precedent, the answer is plainly yes. NCFA standing is self-evident because its members are the object of the rule, and even if it weren't self-evident, or even if there's some question about who the object of the rule is, NCFA amply demonstrated how this rule harmed its members and subjects them to sanctions for engaging in long-standing, common, and beneficial adoption practices. In addition, and for many of the same reasons that NCFA is standing, the rule is also invalid. On the standing point, Mr. Hay, I think the question is whether the declarations are sufficiently specific in establishing that these agencies engage in the precise banned types of practices. Can you identify where you would say there's the most specific identification of recency, of actual frequency of these cases? There's a lot of quite on point, but also very general statements in the declarations. Certainly, and it might be helpful to look at each of the different prohibitions separately. First, there's a prohibition on what we call pre-eligibility soft referrals, which is any eligible for inter-country adoption by his or her country of origin. As our declaration as a record makes clear, this creates a catch-22 in countries like Taiwan, the United Kingdom, Uganda, Nigeria, and Pakistan, where eligibility is not determined until a child, until an adoptive family or parent has been identified and is pretty far along in the adoption process. As far as specific references, NCFA member Mary Moo at JA 150 talks about in Taiwan that the country, that there is no documentation that indicates children are eligible for adoption until after a parent has been identified. Similarly, in their declarations, Lucy Armistead and Robin Sizemore at JA 13 and 33, respectively, talk about their agency's practices in non-Haiti where children are not made eligible for adoption until after an adoptive family is in the process. Both of these members, in particular Ms. Sizemore, emphasize their work in these types of soft referrals and say that they engage in these referrals prior to the rule going into effect and they have ceased doing it and would resume doing so were the rule vacated. The other- In the Armistead declaration, you're looking at which particular paragraph that you think is most specific and on point in describing the organization's involvement in this kind of pre-eligibility referral? Sure. I think six and seven of the Sizemore declaration is where she speaks most clearly to it. When she talks about what prohibition she's referring to, she only mentions the prohibition on pre-eligibility soft referrals. She says that her agency would ethically and transparently use these soft referrals prior to the rule going into effect and would resume making such matches when doing so was in the child's best interest for it to be vacated. I'm just trying to really develop what I think the district court was concerned about. I know in part, and maybe less with the pre-eligibility than with the match part, it was concerned that the rule didn't even apply more by its logic. I think that that argument is hard to see preventing standing on the pre-eligibility practice. But here, for example, in the paragraph you point to, it's still pretty general. Prior to February 13, 2018, ABI occasionally would make, ABI would consider, ABI would perform. It's very general. We don't know a decade prior. We don't know how frequently. When we have standing analysis that requires it be imminent, I'm just trying to really pin down what your best case is for the concreteness and the actually impending nature of the injury that's identified in these declarations. Certainly. There's a bit of a challenge because there's confidentiality concerns about discussing specific closed adoptions, and it's impossible to predict what adoptions may come in. As Ms. Sizemore mentioned, these are primarily non-HAIG countries, and adoptions in countries that are not signatories to the HAIG tend to be more unpredictable, and every adoption truly is different because you don't have a governing international system. What might help here also is the supplemental declaration of Dr. Daniel Nierbas at JA275, where he talks about his agency's work and consistent work in Uganda and Nigeria, and how those countries do not make eligibility determinations, not just prior to a family being identified, but a family actually goes to the country, meets the child, cares for the child, and then after some period that could be as long as a year, goes to court, and the court makes an approves the child's adoption. There's a good deal of specificity in Dr. Nierbas's declaration about those two countries in particular, and their unique, their specific requirements for eligibility. As for the other prohibition on holding, we've mentioned our brief that the declaration of Ms. Perelstein in JA31 gives the clearest statement of harm, where she says since the rule went into effect, families have come to her agency who want to adopt a specific child and can't because she can't give some assurance that the specific child of interest would be available for them to adopt at the end of their home study. The district court found this to be too vague because Ms. Perelstein didn't explain what she meant by some assurance, but she did. She said some assurance the child would be available. I think on its face it describes a hold, and certainly right in the light most favorable to NCFA and in favor of standing, this describes a hold. But if there were any question, Ms. Perelstein submitted a supplemental declaration saying that she was in fact talking about a hold, and that arguments about the scope of the rule, quote, have no bearing on her testimony that the JA278 paragraph 4. So I think that that shows that this is a practice that our members are engaging in, in particular in China. And this is, I think you asked a question about frequency. It's hard to gauge specifically frequency, but what I can say is that soft referrals are used overwhelmingly in special needs adoptions where children need oftentimes specific advocacy to find families who are willing and equipped to take on the challenges of caring for a child with severe medical or developmental needs or taking on a child who is near the age of leaving the foster care system in his or her country. And these adoptions often, in fact, Hague's Guide to Good Practice document recommends that agencies should, what's called an adoption terminology, reverse the flow, meaning identify a child and advocate for the child to try and find a family, and then begin the home study process. Because when you are advocating for children, it's oftentimes the best approach to look for children, for families who may have experience with a special need, have a specific moral or religious calling to care for children who have special needs, and these people may not be actively looking for an adoption and may not have started the home study process. I guess one of the questions is why would one not be able, well, you can line up and do the home study for such a family, but your point is that they might be willing, faced with an individual child in a way that they wouldn't be willing to be open to being considered more generally as an adoptive family? So imagine a case where a family has a child with, let's say, a bleeding disorder and is interested in adopting another child with the same condition and finds out that, or finds out there's a child in a foreign country who has a disorder and needs care, and that family goes to an adoption agency and says, we want to adopt this child because this is the same condition that we're experienced with. We think it would be great to have siblings who have the same condition. And the adoption agency says, okay, we're going to put you through a process that costs thousands or tens of thousands of dollars. It's invasive. We're going to go through your finances, go through your criminal background checks, talk to your employers and your friends and your family, inspect every corner of your house. At the end of this long, invasive, and expensive process, maybe you can adopt a child that you know has a different condition or no condition at all. A lot of families, particularly families who are of modest means, aren't able to make that commitment. There are families who make the decision to expand their family through adoption, go through the home study, and then look for the child or children that will add to their family. But that's not the way that every adoption starts, and it's oftentimes not the way adoption of kids with special needs begins, which is exactly why programs that allow these pre-approvals to occur. I'm sorry to interrupt, but how would someone learn about that child if they hadn't been approved? If the child hadn't been approved? If the child hadn't been approved, you're saying? Yeah. Yeah, going back to pre-eligibility. I understand, right, that there are these two, and you were talking about when the family hasn't yet been cleared. Certainly, and this may be helpful clarification. So when we're talking about eligibility, we're talking specifically about the regulatory eligibility for inter-country adoption, and this is either a judicial or administrative process in every country determining not just that the child is adoptable, meaning the parents are dead or no longer competent, but also that inter-country adoption in particular is in that specific child's best interest, which requires the determination that they're not likely to find an adoptive family within the country of origin. So in many countries, and Ms. Mu talks about in Taiwan in particular, they make a preliminary determination that the child is adoptable, and that allows agencies to begin advocating, but the actual determination that they're eligible for inter-country adoption isn't made until the end. And of note, this is actually what's common in the United States in foster care adoption. When a child is committed to the care of foster care, parental rights aren't terminated because the hope is that the parent who may be incarcerated or in some situation where he or she can't care for the child, the hope is that they will get to a point where they can be reunited with their child. If that doesn't happen and the court's determined that adoption is in the child's best interest, then at the very conclusion, the court makes an eligibility determination, severs parental rights, and transfers rights to the new parent. So it's very common to separate this initial adoptability decision from the actual eligibility for inter-country adoption. Mr. Hay, you described the process for home study as long, invasive, and expensive. Can you expand on that a little bit? How many hours would you estimate an adopted family has to spend on this process before the home study is completed? Certainly. So there's education requirements that I believe are a minimum of 20 hours, and that's just classroom time. There's also homework and additional readings. A lot of agencies will have supplemental requirements about specific countries and specific needs, and then that's part of the home study. In addition, there is multiple meetings with social workers, at least three meetings. You have to provide an extensive binder of documentation of every legal birth certificates that have been verified and background check for every country that has been, every state where you've lived. You also have to write statements about yourself, your family, answer numerous questions. So I'm not sure the exact requirement you're on. I'd probably guess, you know, well over 50, possibly up to 100 hours. I think the Center for Adoption Policy Amicus brief mentions that the average cost for home study is around $7,000 or $8,000. It can often be much more, particularly for families who have moved around a lot and have to do more state checks or for more intensive special needs adoptions with a specific training or consultations with doctors. That's helpful. And then just in terms of how a hold works, my impression from the record and from the briefing is that the adoption agency will do one of two things or maybe both. And you tell me which of these they do. Once they put a hold on a child, they no longer tell other adoptive, prospective adoptive parents that that child is available. Or they no longer let other adoption agencies know about that child. Is it one of those or both of those? I think it's both of those. And part of it will depend on what the country's requirements are. What Richard Klarberg explained in his Amicus brief is that a match and a hold are really two sides of the same coin where an adoption agency will make a match. And if the foreign country approves a hold, then the foreign country will no longer make that child available to other adoptive families until the adoption is complete or until the family either chooses not to go for the adoption or the hold period expires. I think in particular, if you look at J151, I think this is an awesome email from Ms. Mraz, who's an NCFA member, who talks about how when a match is made, the country will no longer make the file available to other families, China in particular, a representative of the Chinese Child Welfare Agency in J165 talks about locking files. So it really depends on what the foreign country will do. But yes, once the agency makes a preliminary match, a soft referral, they will stop seeking other families because it doesn't make sense to begin recruiting more families, just tell them somebody is ahead of you in line. Go ahead. I was going to change topics. I thought the target of the hold rule was more when an agency is holding contrary to the ability of the foreign country to make a sooner match, for example, or make the file parents. So you described the foreign country approving a hold. And I didn't see that as the principal target of the rule, actually. So what the rule says is that this guidance applies regardless of the actions of the foreign country. And in fact, at the State Department after bracing was completed in December of 2019, had to issue a clarification recognizing that its initial guidance described a broader range of conduct than it intended and said that participation in a program approved by a foreign country does not guarantee that you are complying here. So it's a baseline requirement. You have to comply with what the foreign country requires. But in addition, it goes further and says you can't do anything to discourage or dissuade another family or another agency from adopting. And that's very broad terminology. The state hasn't explained how far it goes. It's telling people we have a family who has their heart really set on this far along in the process. That would be discouraging to me if I was a second family. I would feel bad about going forward and possibly upsetting that match. A state has also said there are limitations of what we can say to foreign countries, what we can advocate for in those countries. And maybe terminologically, the idea of an agency making a hold doesn't make any sense in this context because it's foreign countries who determine whether to hold for a child. Ultimately, but an agency can, as a practical matter, control information, right? I don't believe so because an agency can always go to the foreign country and say, we're interested in this child. It's not as though files are unique. These are electronic files where if a country chooses to send it to one agency, they could also send it to another country. And China, in particular, has found it effective to assign files to specific agencies so that one agency is putting all their weight behind advocating for a child. Rather than having agencies recruiting multiple families, having multiple families invested in one child, it makes much more sense for China, which has an interest in making sure all the children are adopted, to spread out the work and make sure every child is being advocated for. And the effects of this rule, as explained by our MIKI and our brief, have been unfortunately devastating for inter-country adoption. In China, in particular, I put note to all of our briefs. We note that in the first fiscal year, this rule went into effect. Adoption from China alone dropped 57%. And that is the country with which we do the most adoptions every single year. And the country that our members, in particular, Ms. Perlsting, have said has been the most affected by this because there has been a longstanding and very successful program to advocate for special needs kids. And agencies are now limited in their ability to fully participate. Where's the 57% figure you mentioned, I think? Yeah, that's the footnote 12 of our opening brief. And it's from the State Department. It puts out annual reports about adoptions. And we compared the fiscal year prior to the rule going into effect and the fiscal year after. And this was all pre-COVID, which has obviously had another effect on adoptions. But these numbers, I think, stopped in September of 2019. I know, please, Judge Killard. You also had mentioned that as harm, the compliance obligations, maintaining documentation, but that seems that the guidance is pretty clear that it's only encouraging the maintaining of documentation. That alone wouldn't support standing if we didn't have the effect directly on the practices of the agencies, would we? I'm not sure that's true. I mean, it encourages the same way the IRS encourages me to hold on to my tax returns. But it's not just in the guidance that these compliance obligations come in. Agencies have the burden to show that they are eligible for accreditation. And if there is a question, a complaint, a spot check by the accrediting entity, they have the burden to show that they are complying with the rule. The State Department has entirely delegated sole authority for accreditation adverse action to a the only control the State Department exercises is through a regulation and contract that says the accrediting entity has to follow guidance as though it were equal to a legislative rule. That we cite the specific Federal Register provision for the contract in our brief. And in addition, the software parole rule purports to interpret a provision that state itself has a mandatory requirement, meaning that if an agency doesn't meet 96.35 best interest, it cannot be accredited. And the accrediting entity has no discretion. At 22 CFR 96.27a, it must deny accreditation to an agency that seeks accreditation and violates the software parole rule. And 22 CFR 96.71b, if it finds an accrediting entity has violated software parole rule, it must take adverse action. And what the Adoption Attorney's Amicus brief explains at page 13 is that the accrediting entity is currently making demands of agencies to show specifically when they began or to document that they are complying with the rule. So these compliance obligations run to every agency. They have to show not only that they follow in every instance the rule and can lose their accreditation if they don't. They also have to show that their policies comply with it. And that's exactly what Sarah Moranis talks about at page 255 and 257, where she shows she's changed her policies to comply with the software parole rule. Mr. Hay, we haven't talked about whether the district court erred in striking the supplemental declarations. My first question is, would you agree that motions to strike only apply to pleadings and that these declarations weren't pleadings? Certainly, Your Honor. I know motion to strike has been used oftentimes for evidentiary purposes, but this wasn't a 12-F motion to strike. That's correct. Should, well, this may or may not go to whether it was appropriate to strike them or not. Or why didn't you just, why didn't you file them earlier? So we didn't file them earlier for a few reasons. The first is that we reasonably believe that our standing was both self-evident and established based on the initial declarations. They were filed in response to something the state said in its opposition to our motion for summary judgment, where they said NCSA still has not identified a member who has engaged or would engage in the practice. That was an incorrect statement. We believe that it misinterpreted our declaration. But rather than fight about what the declarations mean and what they really meant to say, we let the declarants speak for themselves. We identified- Hadn't they first said that in their motion to dismiss? No, because we hadn't submitted the declarations yet. And in their motion for summary judgment, they simply reincorporated the motion to dismiss briefly. You're saying that as soon as State Department made the argument that your initial declarations were insufficient to support standing, at your very next filing, you submitted these supplemental declarations? No, there was a reply brief to the motion to dismiss, and we didn't file any supplemental declarations with our motion for summary judgment, which would have been the next filing. The reason we didn't is we believe that our standing was self-evident and clearly established. When it became clear later in briefing that there was this criminological dispute about how far the rule reached, we thought it was better, rather than fight over what these people meant, to let those people speak for themselves. And I think of particular import here is the State Department's December 2019 clarification, which occurred eight months after these declarations were filed, long after, I believe, five or six months after the close of briefing in the district court, where they admitted that the initial statement on their website and statements to agencies that all sorts of rules are prohibited goes too far. So I think if the State Department itself articulate what it means, and senior state officials are mis-describing the rule to NTSA members, it seems to be the members- That sounds right. That's helpful. I was going to change the topic again, so if you have a follow-up. On the standing and on the support for it, the district judge held that under 12B1, so as I take it, as a matter of pleading or motion to there's no standing, if we were, we could, I suppose, reverse and remand on that, but you have urged us, relying on Mendoza, to go ahead, if we were to find standing and decide the noticing comment, which is a rule claim, can we do that without also holding as a matter of summary judgment that the record supports standing, and is there any limitation on our ability to do that here? I think that if the decree was, the judgment was to enter judgment, then yes, we'd have to meet the summary judgment standard, but I do believe that since we have relied on the administrative record and submitted declarations, we have gone beyond the pleadings. We're not simply, as Lujan talks about, making avertments over standing, but we have no dispute about what it means, but there's no dispute that what our declarants have said is true. I think that is a sufficient basis to find, as a matter of summary judgment, that we have standing. I think, in particular, even though the district court ruled on 12B1 grounds, the consideration of facts and not just accepting the allegations as true, I think, did go to a summary judgment type analysis. That's why we don't really fight about whether this is 12B1 Rule 56, is because we think we've met both. We obviously moved affirmatively for summary judgment, so we think that the record is clear for that. We do think that would make sense to reverse on standing, and then also to go forward, as the court did in Mendoza, to decide the merits, because this is a pure legal question. There's no special competency of the district court, and unlike in Mendoza, there's real harm here, as we've talked about. The rule has been in effect for three years, as of this past Tuesday, and during that time, families who would have children have to wait longer or not even begin the process. Children who would be in loving families are remaining, or if it is, longer or permanently because of the rule. So, ordinarily, if a district judge is going to convert a motion to dismiss to a motion for summary judgment, they have to give notice, and I take it your position here would be, well, there was briefing on summary judgment, so that's enough notice, and then, you know, the district judge didn't say a lot about it, but in finding that it was prejudicial for the second declarations to be included with the reply, and I can ask this of Ms. Lopez, but presumably, their potential prejudice would be if state wanted to put in contrary evidence. I mean, on a summary judgment sequence, that would be one of the things one would suspect would be a source of prejudice, and why isn't that a problem for the proposal that we go ahead on summary judgment here? I think it's a problem because state also cross-moved for summary judgment, and a summary judgment brief said it was entitled to judgment based on standing, and so if state wanted to put on contrary evidence, it could have done so in a summary judgment brief, and whatever reason, I'm not sure why, it chose not to do so. Mr. Hayes, did you file a statement of material facts not in dispute? This wasn't required under the local rule because it's an APA challenge. There's a local rule in the district court that that's only required for non-APA cases, and no, we did not. Even for standing? Does the rule also apply to standing issues? I believe it does. I think it said it applies to, I believe it incorporates either the APA or actions against government agencies. That's my recollection, at least, of the local rule. It doesn't apply to standing. Okay. I'm sorry. Go ahead, Your Honor. I was just going to, well, actually, Judge Walker, you had said you had questions moving on from that. Why don't you go ahead? I'm actually good. I appreciate it. Okay. On the notice and comment claim, doesn't it just stem from a policy disagreement with the State Department on what's in the best interest of the child? If so, how is that a legislative rule requiring notice and comment? I don't believe it's a policy difference for a few reasons. One is that this is a statement that is guidance documents posted on websites that have the effect of legislative rule. If it's binding in the field, if agencies believe their permits will be declared invalid for non-compliance, if it's treated like a legislative rule. All those are met here because the State Department has instructed its accrediting entity to enforce this rule to the letter in every enforcement action. The regulation has deprived the accrediting entity of any discretion to reach a different any violation of the rule. The fact that it's required though, I mean, the best interest of the child standard is required. If State were to articulate a specific guidance that was mandatory that no child should face a prospect of abuse in a placement or no just unnecessarily delayed where the best interest could be met by more prompt action, those would be more specific rules. But wouldn't they also just be policy interpretations, guidance, clarification of the best interest of the child standard and not separately require notice and comment? Two points in response to that quickly, Your Honor. First is that it may be theoretically possible that State could say we have determined that this specific act is so harmful that it cannot be done in any adoption consistent with the best interest of the child. State didn't do that here. What they said in fact is that these are oftentimes harmful to children, which means that there are times when they are not harmful to children, that there are times where soft referrals increase the number of families willing to adopt or expedite the time where an option would be completed. Second, and I think this court's recent decision in comparison to the rule here, in poet what the court recognizes that an interpretive rule must be fairly viewed as interpreting a statute or regulation. There is nothing interpretive at all about the soft referral. It never cites, quotes, engages with any statute or regulation or the convention. In fact, the only part, the only point where it mentions regulations, the JA62 in response to FAQ1 where it says the rule is based on, is an interpretation of policies that are consistent with statutes and regulations. Not that it's interpreting the regulation themselves, but rather it's interpreting policies that it believes are consistent. What this court has said repeatedly is that consistency with the rule is not a hallmark of interpretation. Plenty of things could be consistent with the rule. When an agency is choosing amongst many different options how best to exercise its delegated legislative authority, that is a legislative act. What the court said also, and going back to the comparison of poet, the court there said it could hardly be clear if the guidance there was interpretive in particular because it never deviated from the regulations. Again, there is no engagement at all with the regulation here. In fact- You've already mentioned a few places where you characterize the agency as treating the guidance as mandatory, having a binding legal effect. Some of the briefing talks about it that way, but where would you point me in the record to the best evidence that an accrediting entity is actually categorically bound to follow the guidance as opposed to prudentially likely because of their need to maintain accreditation? Certainly. The administrative record here stopped, I think, the day after the FAQ was published, so we don't have any enforcement actions in there. Because enforcement actions are taken by a third party, they wouldn't even be in state's administrative record. What I would point the court to is a few things. In MIECHE, the Adoption Academy brief at page 13, says that the accrediting entity is enforcing this. There's also Mr. Klarberg's amicus brief talks about, I think it's at pages 20 and 21, a case a few years ago involving state's international adoption, where his agency, the Council on Accreditation, was at the time the accrediting entity, and they believe the guidance stated issue was incorrect. They told the state this, and states said, regardless of what the guidance says, you have to enforce it, and as a result, you have to strip these agencies of accreditation. Those agencies went to court. They obtained a preliminary injunction. The court found they were likely to show that the guidance was, in fact, a legislative rule, but for those agencies, it was too late. Those agencies, I believe all three, or at least two of them, went out of business. We have a declaration from one of them, Ms. Alberts at ECF 24-2. It wasn't in the JA, but it's ECF 24-2. Her agency was forced to close because the state department forced the accrediting entity to treat its guidance document, its unlawful guidance document, as a legislative rule and deny accreditation on that basis. So we think there is strong reason to suspect that the accrediting entity will do what it's required to do and enforce these rules as though they were legislative. And just a final point in response to your question about how this is not just a policy disagreement. It can't be a policy disagreement because it rewrites provisions of the legislative rules. In particular, it imposes timing requirements on when home studies have to be completed and when eligibility determinations have to be made that don't exist in legislative rules or the convention. And more directly, it redefines what best interest of children means. This is a very common term. It's probably the North Star to most areas of family law. And in all states, all countries, under the convention, as the Center for Adoption Policy explained, this is a case-by-case, fact-dependent decision that looks to the child's needs and what would be in that child's best rulemaking back in 2006, or 2003, excuse me, chose to incorporate state law wherever possible, in particular, to adopt state law on best interest of children. This makes... All right. All right. I mean, we've given, we've taken you well over your time, and I appreciate your responsiveness to... I appreciate it very much. Judge Walker, do you have additional questions for Mr. Hay? No, thanks. All right. Thank you. We will give you a brief rebuttal time. Ms. Lopez, good morning. I please the court, Carolyn Lopez, on behalf of the government. I want to start out where the court did with really focusing on understanding, because there's still been a mischaracterization of what the conduct that's actually prohibited actually does. And so I think we're all on the same page, but I want to make sure, and I'm going to take each in turn, that narrowly, all the guidance says with respect to children who have not even yet been deemed eligible for inter-country adoption, is that it's inappropriate to refer those types of children to parents. And that's consistent with the State Department's prior debarment action at JA-117. Ms. Lopez, that's even if it's an unofficial match, correct? Correct. And the reason for that, and there, that's because, as the State Department described, it boggles the mind that you would need a specific regulation in this context, in which for a child to sort of even come into this context, they have to be at least eligible. What do you say to the example of Taiwan, for example, which you know what I'm talking about? Yes, that actually mischaracterizes what's going on in Taiwan. And I think it's really important to drill down into that, because that's actually a mistake made both in describing Ms. Lopez and in talking about the termination of parental rights. And so that there, the confusion there is that the distinction between the termination of parental rights, which in some countries doesn't happen until the end, and a determination that the child is actually eligible for inter-country adoption. And those are not coterminous. And we know those aren't coterminous from the articles of the convention themselves. So that's Article 4C recognizes that the termination of parental rights isn't always necessary for a child to be determined to be eligible, and also Articles 26 and 27 of the convention. And so when one looks at what Ms. Mu actually said, so this is at JA-138 and JA-150. At JA-138, she describes specifically Taiwan as a country where there are children who are, quote, legally eligible to be Taiwan as children who may be, who have already been determined to be legally adopted. And then again at JA-150, she talks about how these are children that have already been registered in Taiwan, i.e. registered for adoption, inter-country adoption, and that a determination has been made by their orphanages. Let me see if I'm following. Your position is that an adoption from Taiwan could work like this. The government of Taiwan declares a child eligible for adoption, even though the child has not been even informally, unofficially matched with an adoptive parent. Then the adoptive parent goes through the, then a match occurs, a hold, if you will, occurs, and then Taiwan's government says this child can do an inter-country adoption. No, Your Honor, that's not what I mean at all. What I mean is that, and thank you for the opportunity to clarify that, a lot of this confusion arises, I think, because plaintiffs, and don't tell me what they said, just tell me what, how, tell me how an adoption in Taiwan would work. Sure, so an adoption in Taiwan works this way. Taiwan says this child is eligible for inter-country adoption. We're going to add them to our registry. The child is then eventually matched with a parent. As part of that... Held? Officially, like held? Well, any holding, and I do, any holding, as the guidance makes clear, that's done by the country of origin, so Taiwan, is fine. It's only when the adoption service provider is doing the holding instead in such a way that prevents other families from considering the family or Taiwan from making a different choice that it's a problem. So there could be... What if the agency does something that prompts Taiwan to hold the child? Is that allowed? So as the December 2019 guidance made clear, the agency can continue to advocate for their family, but what they can't say is, Taiwan, you should adopt a proposition in which you always hold these children no matter what. But they can go, I thought, I mean, he can speak for himself, I thought Judge Walker's question was, is it okay for the agency to request that the country government allow a hold? It's okay... In an individual case. Sorry. So the 2019 guidance, December guidance, says it's okay for them to continue to advocate for their child, sorry, for their family that they're representing, and to say, we think that you should still pick our family over the other family. So that's a specific thing, but what they can't do is say, we think you should always, no matter what, hold this file. But I do just want to get back to the distinction between... I just want to make sure we're all on the same page about this distinction between the termination of parental rights and eligibility for inter-country adoption. And the reason that it makes sense for some countries to separate that out is what they're saying that they are making all those Article 4 determinations. So the child is actually eligible for adoption. Second, that inter-country adoption and not domestic adoption makes sense. And third, that if there are any remaining parents, and there would be with this termination of parental rights question, that there's been free and non-coercive dissent. But what they might do is still want the child where there are living parents to have some sort of legal tie to those parents while the adoption is being made. And then also the hate convention recognizes that in some countries, there's not a total termination of parental rights, and there may be some sort of relationship thereafter. And so it's really comparing apples and oranges. And I do just want to emphasize again that Mary Moo, which is the one sort of record evidence that they provide, she herself says that Taiwan is talking about eligible children who have been registered. And at JA, I think it's either 263 or 265. After the May guidance is issued, and after she's asked these questions, she says the State Department has answered all of her questions. And so- Let me see if I've just followed you so far. I'm going to describe an adoption from Taiwan, and then I'm going to have two questions. The first question is, would State Department consider that the adoption agency did anything illegal? And the second question is, would Taiwan allow this adoption to happen in this sequence of events? So is it okay with State, and is it okay with Taiwan? And here's the- I'm going to tell you the sequence of events. Taiwan declares the child eligible for an inter-country adoption before the child has been even informally matched with any American parent. Then the adoption agency informally matches that child with an American family. And the adoption agency hopes that Taiwan will hold that child, but the American agency is not allowed to request that Taiwan hold that child. Then Taiwan completes the last of what's required in order to terminate parental rights and make the child completely 100% eligible for an adoption. And then at that point, the child goes to the American family. Is that- Would Taiwan allow that to happen? And would State Department allow it? I actually can't get that much more into what Taiwan does and doesn't do outside of this particular record, but I can say that generally seems correct to me. And I do want to just clarify one thing. Again, looking at Articles 26 and 27 of the Hague Convention, the termination of parental rights sometimes doesn't even happen until after the end of a final adoption. And this is really why it is done is that the child has to actually have been deemed eligible for intracountry adoption. And the question of what happens with the termination of parental rights is a formal matter of various country by country. And as the one person who brought up Taiwan said, the State Department's guidance answered all of her questions. And then- Okay. No, go ahead. So that's sort of the eligibility piece. And I'm happy to sort of talk through any of the that we talked about, the scope of the soft referral to parents who haven't been- Excuse me. What determines the child's eligibility if it's not dependent upon parental rights? So a parent in an adoption, one can imagine that a parent could consent to the child being legally adopted by other parents, but might want some sort of continuing contact with the child. And the Hague Convention itself clearly separates out those steps. So Article 4, which is the article that's all about how the state makes that eligibility determination, Article 4 says, 4C says, including that parental consent has been made, including in countries where that will result in a termination of parental rights that they've been appropriately apprised that that's one of the consequences. Aside from the interaction of the child with the natural parents, what determines, what else is there to determine eligibility? It's that they're eligible for adoption in the first place. So even domestically, that they're eligible for adoption, whether that's because their parents have died, their parents have- What's the criteria for determining eligibility? That that's vested with the country of origin, and it's in their discretion to determine whether one of the factors have been made, which as we've been discussing, might be that the child's been abandoned, might be that the state has made a finding that the parents aren't competent to raise the child, might be that the child's parents are deceased. So that's a question of eligibility for adoption generally. And then there's a secondary question of whether inter-country adoption is in the child's best interest or staying within their country of origin is in their best interest. And if there are surviving parents, that parental consent piece that we've been talking about. You might have parental consent without having gone formally through a termination of parental rights. The parents are prepared to do it, but it just hasn't happened. And as you said, it can be useful to have a strand of parental right remaining as it's sort of like real, I mean, this is a craft, but real estate, you know, contract and closing that there's a reason to have two different moments when everybody understands what the plan is, but it hasn't actually been effectuated. And that's very country dependent, sort of whether termination of parental rights is sort of co-terminus with that original decision or happens later at the process. And then if I might just, and none of the declarants here say that they've done that. So for example, Armistead, who's one of the declarants that they rely on, at paragraph six of her declaration, she actually specifically says that the types of soft referrals that her agency used to engage in were between adoptable children. Now adoptable children, that's exactly that for a definition that adoptability has been determined. So she's not saying that she's matching children. So I understand Ms. Lopez, that there's been some kind of misunderstanding of the bar on against holds and that it may, some of the declarants may have mistakenly read it as barring more than it does. But what about the Sizemore declaration, which addresses only pre-eligibility adoptions, meaning where the family hasn't had the home study? And it seems like that's been more clearly understood. And why doesn't that declaration establish that? Sure. So on the Sizemore declaration, particularly because we're talking about a motion for, we're at the summary judgment stage in terms of the record, she just hasn't done enough to link up her statement indicating that she understands that the guidance prohibits referring children who've not yet been deemed eligible to what she actually does. So the two types of things that she's talking about are special needs adoptions and kinship adoptions. And with respect to special needs adoptions, those are eligible children. They're not ineligible children. And she's talking about recruitment and the guidance talks about all sorts of things that you can do to recruit families in such situations, including photo listings, for example, of eligible children. And then the other thing she talks about is kinship adoption. And here, again, it's a very conclusory, so we don't know exactly what they used to do, how often they used to do it, and whether they're likely to do it again in sort of a clapper sense. And that's particularly underscored here where- I just want to interrupt you because there's an overall problem lurking in this case. And I don't think you've addressed it. You've done a fine job of picking apart the declarations. But the question is, as you said, it's on summary judgment. And on summary judgment, the declarations and affidavits of the non-moving party have to be given credit and deference. You can screw them in the light most favorable to the non-moving. And if we do that with each one of these matters that you're taking apart, and I think very artfully, you lose. No, Your Honor. I don't think so. Because even at the summary judgment stage, it remains their burden to show that they actually have standing. And while the court can sort of make- I'm not talking- Pardon me. Pardon me. I'm not talking about burdens. What I'm talking about is how you construe the affidavits and the declarations. And they have to be construed in favor of the non-moving party. That's just standard black letter law. Yeah, absolutely, Your Honor. But what this court has also said in the standing context is at any stage, whether that's the pleading stage or the summary judgment stage, the court isn't to fill in logical gaps between what they have actually said in their declarations. And so in the State Department's view, they have left those gaps. And so we don't know- Tell us more very precisely what you see as a gap. You said a few moments ago that you thought that the Sizemore Declaration hadn't been enough, even though she's correctly describing the practice. And when she talks about family recruitment, there's no question on that side of the equation about the hold and when something is deemed to be an impermissible hold and when it's not. She's talking about can we- I mean, it was the issue Mr. Hay was describing in some detail. Can we as an agency work with a family that is particularly motivated with respect to a and make a permissible match, otherwise permissible, before that family has been deemed eligible? And the answer to that is yes. I thought we were talking about sort of the part of Sizemore that goes to eligibility of children. So the guidance makes clear that if what she's talking about is matching an eligible child to a family that just hasn't undergone its suitability determination, it absolutely can do that so long as it doesn't interfere with other families' ability to consider that child or interfere with a country of origin's ability to make a different choice. And the reason that I think she sort of does, I agree, seem to be talking about that at times is because when she's talking about recruitment, like again, recruitment of children with special needs are eligible children. And similarly, she sort of talks about the need to children. And then just very quickly with respect to the kinship adoptions, at question four of the May FAQs, the State Department clarified that, in fact, adoption service providers can accept applications from families who have pre-identified a child, including in relative situations, consistent with incorporating the limitations in Article 29, expressly incorporating the interpretation in Article 29. And so because we don't know, she just says she has changed what they've done in kinship adoptions, but because the guidance allows them to still do things and specifically has a, you know, question four about that, we just, she would just have to give more details. We don't know. And even at sort of taking all inferences in her favor, she has to provide more explanation. What would she have to say? I'm just really trying to understand because obviously level of specificity is a spectrum. What about what she has said about pre-eligibility adoptions is inadequate? She does say in paragraph eight, as you noted, Hopscotch immediately ceased certain recruitment efforts to comply with the guidance and even limited our ability to complete kinship adoptions. So she would have to explain how it limited her ability in kinship adoptions. So if, for example, it's just that they stopped accepting applications from kinship adoptions, that would be sort of a self-inflicted injury because Q4 tells them that they actually can do this. She'd have to actually say the reason it stopped kinship adoptions is because we were proceeding with kinship adoptions involving ineligible children. It's a pretty short sentence and it's something that's within entirely within their knowledge and not the State Department's knowledge in terms of what they actually do. But as Judge Randolph was saying, it makes, I mean, it seems not at all counterintuitive that, you know, starting with paragraph six, she says, it's my understanding the State Department is taking a position that soft referrals are unlawful when a child and prospective adoptive parents are unofficially matched before the child has been deemed by the foreign country eligible for adoption. And then she basically says, we've been doing that and we're good at it and now we're not. So I think the problem there is when she says it's sort of not, it's piecing together different parts of her declaration. One is that she does understand correctly that the guidance does prohibit referring ineligible children. But then when she's talking about the types of practices that they engage in, she seems to be talking about the other type of soft referral, which is a soft referral of an eligible child to families that may not have completed their home study adoptions. And that's what we're talking about when we're talking about recruitment of children, that sort of those photo listings and the special needs programs, those are all eligible children. They're not ineligible children. And sort of, I think that the kinship adoption gets the closest, but even there in light of question four, I don't think she does enough to describe, sort of even at summer judgment, sort of conclusory saying without any details how often, what exactly you're doing when it's in totally within your own knowledge is insufficient. And that's sort of, that's our view of why the Sizemore Declaration is insufficient. If I might turn to, I'm happy to sort of, if I might turn to the sort of the other part of the conduct, because they have to show standing with respect to each part of the conduct to actually have standing to challenge those, the relevant portions of the guidance with respect. Well, they're challenging the guidance. I mean, I don't think they're challenging just certain sentences of it, right? And either injury on the, all of the pieces of the guidance address both practices. I mean, I'm not sure because they're not separate claims that you're actually right, that they would have to establish standing with respect to both facets of the guidance in order to say the guidance as a unit needs to be. We think that they would. I mean, we agree that there are certainly parts of the guidance that speak to both types of self-referrals, but also that there are parts of the guidance. So, for example, whether or not a child is eligible in the first place has nothing to do with hold. So, the part of the guidance that has to do with adoption service providers doing holds instead of the country of origin, doing them just aren't implicated. That sort of part of the guidance isn't implicated at all by this eligibility question. So, in our view, you know, sort of anything in the guidance that's sort of fairly classified as it obviously goes to sort of both types of narrow conduct, as long as they sort of show standing with respect to either, that's enough. But the parts of the guidance that really are discrete and come from discrete pre-existing obligations, you know, they would need to show that somebody is actually doing that. And I did if I might turn very briefly to just to make sure that we're all on the same page about what the guidance does and doesn't say with respect to parents who haven't completely undergone their home study evaluations, especially with respect to the program in China. That is not something new that's talked about in the December 2019 guidance, which, you know, I'm sort of surprised to hear plaintiffs say completely changed the game because in their opening brief at page 13, note three, they say the new guidance does not change the scope of the rule. And that's exactly the State Department's position. The district court held, as the district court correctly recognized, for example, at JA 92, note four and JA 286, the March and May guidance already made clear that this wasn't some sort of broad categorical ban. And instead, with respect to this particular question, that it made clear that really what we're talking about, and I'm sorry if I sound a bit like a broken record, but I just want to make sure that we're all on the same page, that it's just about the, it's the difference between it being in the hands of the country of origin to make the decision to hold or the adoption service provider sort of preventing other families from asking about that child or interfering with those adoption service providers reaching out to the country of origin. And specifically with respect to the China program, as early as JA 59 through 60, which is that first March guidance, the guidance comprehensively discusses the China program and specifically says that it isn't saying anything about China's hold that file. So if a second family comes to China, China is free to say, no, we're still holding that file for that family. And that's completely consistent with the statements from the Chinese central authority, which at JA 104, in which it's clear that China says, which is reflected in what the guidance says as well, that it was never China's intention that the files would be sort of locked away just for the agencies that originally posted them. They always intended that different adoption service providers should be able to reach out to China. It also makes clear that it's China that does the locking of the file and not the adoption service provider. And that really makes sense with the structure of the Hague Convention, which that's that sort of ultimate authority over what should happen to the child and essential authority in each of the countries. And it's not sort of farmed out to these individual adoption service providers to interfere with that ability to make that determination. Can I ask you, on the standing issue, is there additional evidence state would present at summary judgment? I'm trying to understand the district court's prejudice holding. So the way I actually understand the district court's analysis here is entirely consistent with this court's warning in such cases as Sierra Club, in which in Sierra Club, the regular standard, and what we're looking at here isn't a question of whether the district court would abuse its discretion in letting in the declarations. It's whether it abuse its discretion and not letting in the declarations. And what Sierra Club has long put folks on notice of is absent good cause. And I haven't heard anything here to say that there was actually good cause here. At the first appropriate moment in litigation where a serious question of standing has been raised, they need to put in their evidence. And as we've been discussing, that was clear from the motion to dismiss. It's always in the state's position that the guidance isn't this broad categorical ban. And then when they filed their 10, as we've been discussing, when they filed those 10 declarations, the state department's reply brief said, no, these aren't enough for the exact reasons that we said before and the same reasons that I'm discussing with your honors today. And then here, it was simultaneous motions for summary judgment. And so, again, the state department re-raised that exact point that they didn't have standing in their opening brief, the state's opening brief. The NCFA didn't attach the replies, the additional declarations to their response to that or to its own opening brief. It really, as the district court said, waited until the 11th hour without any explanation for why. Can you please answer Judge Pillow's question, though? I didn't, she asked, would you have filed something in addition? I didn't get an answer to that. I don't, I can't say sitting here today, I don't know whether or not we would have filed additional summary judgment evidence. But what I will say is that- Where was the prejudice? The prejudice is that there shouldn't be sort of these, like, shifting declarations. So, for example, Nurboth and his declaration, I can't speak to, I wasn't a trial attorney. I can't speak to, like, what my client would or wouldn't do. But just myself looking at the declarations, one of the things is that Nurboth says a bunch of things about what may or may not happen in Uganda and Nigeria. And so that's something that there might or might not be evidence about. But I know you weren't the trial attorney, Ms. Lopez, but you've seen the supplemental declarations. And it's possible that a response to those supplemental declarations would be It's possible that your response would be futile. And if a response would be persuasive, I would think that it's your position that you would have filed some kind of additional evidence. And if a response would be futile, then I think it's appropriate to concede that. No, I mean, I apologize, Your Honor. I mean, I, you know, I don't have a stance on exactly what evidence would or would not have been put into the record had the declarations been properly put in. But what I can say is that that sort of flips the way this is all supposed to work precisely because parties should have time to figure out what evidence makes sense to put in and to not put in. Parties aren't supposed to wait until the 11th hour to put in this new type of evidence that was entirely within their control. Although it was a little bit irregular the way the district court handled it in the sense that district judge had not ruled on the 12B1 that he ultimately granted before the summary judgment briefing but called for summary judgment briefing and it is a fair inference for the plaintiffs to think that their explanations of how these documents affected them was sufficiently detailed and therefore did establish standing. And then when they see the arguments on the cross motion, they think, well, we better bolster this because actually, you know, state is taking this as a seriously still in contention when we, for some reason, in light of the procedural handling of the case, for some reason, thought was not really still disputed. No, your honor, I would disagree for a couple of reasons. First, it's not as if the district court said I have found that you have found. It just sort of put off that decision. And second of all, because the state department renewed its standing objection, so they knew from the state department's opening brief that the state department very much thought it was a live issue and still stood by everything that it said in its reply brief. And so waiting to not do that. Maybe I'm missing the sequence. I'm sorry. So this is a little bit. I thought they actually, that's exactly what they were responding to. Oh, no, your honor. So the case is a little bit wonky even at the motion for summary judgment stage because they're filing simultaneous motions for summary judgment. And so in the state's summary judgment brief, we renewed our standing objection. The first time after that that they would have had to respond to that renewed standing objection, which certainly put them on notice that the state was sticking by what it said before, was its response brief, at which point we would have had a reply brief. But they didn't do that. And certainly they could have done it at any point. Did you file a fair reply brief to their reply brief? No, we filed a motion to strike the declaration. But there also you didn't say, and we want an opportunity to put in evidence. And under Rule 56D, ordinarily, if you're faced with summary judgment and you want an opportunity to put in evidence, you and your next filing would say, hey, we really haven't fairly been able to do this. Sure. I mean, I think our point was more the point that sort of going back to the Sierra presumptions are that parties are supposed to put these things in to be fair to the party's opposing standing at the earliest possible moment in litigation. And that when they don't do so, and they really wait till the 11th hour like this, they should be struck. I'm also happy to talk about why neither of those declarations actually get them. What federal rule authorizes the district court to strike those declarations? I think that's consistent with this court's jurisprudence in Sierra Club that says that parties shouldn't assume that courts would be well advised to understand that courts are not going to consider late filed affidavits. There's a difference between- And we don't think that there's good cause shown. There's a difference between a court using its discretion to not consider a filing and a court officially striking it. And maybe it's a matter of form over substance. But just on the question of form, is there a federal rule that allows a district court to strike something that's not a pleading? So, I'm sorry. I don't have the federal rules as well memorized as I should. But for example, in the capital sprinkler case, that case sort of came out the opposite of this in that it was about whether or not the district court- And it may sort of be a matter of form over substance in that given that the district court wouldn't have abused its discretion to not consider the declarations and the effect of striking the declarations was that he didn't consider the declarations, it sort of comes out the same way and isn't a reason for the court to now consider those declarations or to reverse. Because it would be the same decision at the end of the day. That's good. That's helpful. I also don't have them memorized. So, you're either in good company or you might not be, but you're in my company. If we hold that NCFA has standing, should we just go ahead and decide the notice in common issue? There's not really any point. We don't, as we said in our brief, we don't, again, we don't think that there's actually standing, but because that's a legal question, we don't object to sort of, in the interest of sort of keeping the wheels of justice moving to addressing the merits question. And I'm happy to, unless your honors want to talk about why the supplemental declarations don't get them there anyway, I'm happy to move on on standing. I'm happy to move on to the sort of legislative rule questions. So, here, what we know from this court's jurisprudence is that a rule, a guidance document, even one that has the effect of altering conduct or announces clearer and crisper details on how a standard, like here, the best interest of the child standard should be understood, does not become legislative where, as in General Motors versus Ruckelhaus, it's just reminding entities of preexisting obligations, or as this court explained most recently in Poet, where it can be fairly drawn from those preexisting obligations. Unlike in Poet, here, the guidance doesn't actually purport to construe language in any regulation. It talks about these type of referrals being inconsistent with existing law, but it doesn't suggest this is an interpretation of any regulation on the book. No, your honor, I would disagree there. I think, you know, they may not have parsed out individual sort of regulatory sites, but at JA62 and JA59, they talk about how these types of referrals are inconsistent with the Hague Convention and the Inter-Country Adoption Act and the regulations. And then again, at that question one that we were talking about, they were explaining that they were interpreting preexisting regulations. And what they also do is they go back to, for example... Which preexisting regulations? They say that they're not announcing a new policy, but that they're actually implementing long-standing policies from the 2006 regulations. Right. So I agree that it's not... It's in the current regulations that have been in place since 2007. I'm just wondering which ones those are. Yes. I mean, which provisions are they interpreting? So they're interpreting this as, I think, you know, and again, these are sophisticated, regulated entities, and everybody understands, as sort of evidenced by the briefing, that what they're interpreting is the best interest of the child standard. And they're interpreting the best interest of the child standard in these two areas that are really critical. And so we talked about this briefly before, but this first thing that, of course, a child's, you know, it's so fundamental that a child has to actually be eligible for inter-country adoption in the first place before they're referred to families, that a prior debarment proceeding by the State Department said, the hearing officer there said, it boggles the mind that you would have to have something more specific than what already exists in sort of the convention and the implementing structure. And then with respect to this question of putting, and we sort of, we described this, the sort of regulatory regime in our brief as well, but in terms of understanding how this works, in terms of the holds and the interference with countries, the guidance, that really has to do with suitability determination that parents are actually suitable to adopt is also a really important safeguard for the best interest of the child. And we know that from Article 5 of the convention. We know that the country of origin is going to have to actually sign off on that suitability determination and have sort of the authority to decide at the end of the day what the best match is. And we know that from Article 17, for example, of the convention. And we also know that these are incredibly important safeguards from the Inter-Country Adoption Act itself. And that's because conforming to these home study requirements is actually a minimum requirement of accreditation and a willful violation of that standard actually is automatic non-substantial non-compliance. And in that context, the state fairly drew from those that where holds that are placed by the, again, the adoption service provider and not the country of origin that prevent other families from considering those children as the State Department describes that can lead to longer institutionalizations and has also led to home study agencies saying that they felt undue pressure to actually approve families because they're essentially told it's this family or nothing. And the reason they're told it's this family or nothing is because the files are sort of being kept away from other families that might potentially be interested. And they said that they felt either undue pressure to actually say that a family was suitable when it really wasn't, or to actually entirely get out of the program. And interestingly, one of NCFA's own declarants, Armistead, said in comments that are in that we cite in the record that she actually thought that it wasn't a good idea to allow holds in the situation at all. So it's sort of a well-documented problem. And there, so there it's sort of fairly drawn from the fundamental way that children's best interest is safeguarded. And as plaintiffs have said today, and also the Center for Adoption Policy has said, they may disagree with us as a policy matter as to whether or not this is something that actually obviously violates the best interest of the child standard, but they have also acknowledged that there could be things that categorically so obviously violate the best interest of the child standard that you don't need a sort of more, you know, it doesn't become something that's subject to notice and comment just because the State Department says, hey, we assume you've all been doing this correctly, but if not, this is really not okay. And then... Although the very importance of it and the confusion that we've seen ensuing would seem to suggest notice and comment would be a beneficial process here to get the input of the, you know, and have a detailed conversation pinning down the nomenclature with the entire global community of entities that are engaged in this. No, Your Honor. I mean, I don't think that that sort of changes whether or not the State Department was actually obligated to do this through notice and comment. And also, I do just want to emphasize here that the administrative record, only some of which was excerpted here, is 700 pages. So it's not as if the agency sort of did this as a fly-by-night thing. They were responding to emerging problems, including in its debarment, which was so serious that it was the first time that the State Department had actually taken debarment action itself, rather than the accrediting entity taking adverse action. Do you agree that adoptions in China are down 57% since this guidance began? I don't have any reason to dispute that particular number, but there is a vast difference between causation and correlation. And so here, even before any of this guidance was explained, the State Department explained that inter-country adoptions generally were down because a lot of countries were focusing on placing children domestically rather than inter-country. And then similarly, one of the reasons that adoptions in China might be down, frankly, is because the declarants continued to mischaracterize the guidance as saying that they couldn't do these types of adoptions, even though as soon as the March guidance at JA5960, the State Department made very clear that they could. So part of that decrease is because adoption service providers were sort of voluntarily injuring themselves by not participating in the program. That's not a problem that stems from the guidance itself. You are advocating that this is just an interpretation of the best interest of the child standard, but we have been offered examples of situations in which conduct contrary to the guidance appears to be in the children's best interest. So how do you respond to that reluctance to accept your view as the State Department employee you referred to said that it boggles the mind that people wouldn't just understand this to be the position, both in this guidance and through a formal department proceeding? And that's well within its expertise, but it goes back to sort of what I was saying about the way the hate convention itself is structured. The very first substantive procedural step that's supposed to be taken is this determination about whether the child is even adoptable in the first place. And that makes sense because, I mean, sort of intuitively, because once a family knows about a child who, so for example, sometimes I think a hypothetical might be helpful here. So sometimes... What would be helpful is if you wrapped your argument up way, way over time. You can proceed and wrap it up. You can proceed. So sorry, I'll try to be as quick as I can. So sometimes a parent who can't take care of a child for a little bit will drop the child off temporarily in an orphanage with no idea that the child might be put up for inter-country adoption. If that child who isn't eligible for inter-country adoption is matched to a family, one might see how the family would put undue pressure on that parent to see their parental rights. And the hate convention is about safeguarding against those types of things happening. And that's why sometimes the safeguards might be a little broader. And it might very occasionally be in the best interest of the child, but you can make categorical rules, as Plaintiff has said at argument as well. All right. Thank you for all of the additional time. Yeah. And we gave Mr. Hay ample additional time, and we appreciate the detailed, informative arguments on both sides. Mr. Hay, you did not have additional time, but as I mentioned, we'll give you a couple of minutes for rebuttal if you want it. Certainly. I'll keep this brief. Just two quick points. First, all this dispute about what declarants meant, how to construe it, as I think the State Department now conceded, that's not appropriate at this stage. But I do think if you look at what the declarant actually says, it started with Mary Moo talking about Taiwan. The waiting children are referred to agencies for family-finding efforts, but there is no document that indicates they're eligible and legally free. Ms. Sizemore similarly said that her agency stopped making these soft referrals. Were the department to rescind the soft referral ban, they would resume making them. So at a minimum, I think that the State Department has come very close to conceding that the dismissal on 12B1 grounds was improper, and that should be reversed. But we do think the court should go further and bank bait on the merits. On the merits, the only thing I heard Ms. Lopez talk about is that this is consistent with the overarching goals and purpose of the inter-country adoption laws. And it may well be. We don't think it is, but it may well be. What this court says repeatedly is that consistency is not the hallmark of an interpretive rule. Many things could be consistent. When an agency is using its authority delegated by Congress to choose a way to enforce the laws, that is a legislative act. That's what this court said in Catholic Health Initiatives, for example, that this sort of policy setting is a legislative act. And more broadly, the best interest standard is the north star of adoption law. And what this court said in Mendoza is that agencies can't interpret the general mission of a statute, that specific meaning, because if they did that, there would be no reason ever to go through notice and comment. Presumably, every regulation and issue is consistent with children's best interest. And if they could use that term to interpret what specific obligations they think support that interest, there would be no reason to go through notice and comment. So for these reasons, we respectfully ask the court to reverse the ruling of standing and vacate the soft referral rule. Thank you very much. Thank you both. The case is submitted.
judges: Pillard, Walker, Randolph